Bretton **BARBER**, a Minor, Through his Mother and Next Friend, Patricia A. **BARBER** Plaintiff,

v.

**DEARBORN PUBLIC SCHOOLS** and **Judith Coebly**, in her official and individual capacities Defendants

No. 03–CV–71222–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 30, 2003.

Andrew A. Nickelhoff, Sachs Waldman, Kary L. Moss, and Michael J. Steinberg, Detroit, MI, for plaintiff.

George P. Butler, III, Dickinson Wright, Detroit, MI, for defendants.

## OPINION

DUGGAN, District Judge.

Plaintiff Bretton Barber, by his mother as next of friend, seeks a preliminary injunction pursuant to 42 U.S.C. Sections 1983 and 1988 and the First and Fourteenth Amendments to the United States Constitution. Plaintiff asks the Court to restrain Defendants from prohibiting him from wearing a particular t-shirt to Dearborn High School in violation of his rights to free speech and political expression. A hearing on Plaintiff's motion was held on September 17, 2003.

## I. Factual Background

When this action was filed in March 2003, Plaintiff Bretton Barber ("Barber") was a junior at Dearborn High School ("Dearborn High"). Defendant Judith Coebly ("Coebly") is, and was at all times relevant to this lawsuit, the principal of Dearborn High.

Dearborn High has approximately 1,500–1,550 students. Reflecting Dearborn's population, which has the largest concentration of Arabs anywhere in the world outside of the Middle East, approximately 31.4% of Dearborn High's students are Arab. Many of those students' families immigrated to the United States from Iraq. According to Coebly, these families left Iraq because of former Iraqi President Saddam Hussein's regime.

Coebly has been an employee of Dearborn Public Schools ("DPS") since 1966. After serving as a social studies teacher and counselor, Coebly served as an assistant principal at Edsel Ford High School ("Edsel Ford") from 1985 through 1995 and as an assistant principal at Dearborn High from 1995 through 2002. Coebly has been Dearborn High's principal since the beginning of the 2002–2003 school year. She has two assistant principals, Michael Shelton ("Shelton") and Charles Baughman. Shelton has spent six years as an administrator during his thirteen years of employment with DPS. He became Dearborn High's assistant principal prior to the start of the 2001–2002 school year. Among his duties, Shelton is responsible for supervising Dearborn High's three lunch periods.

On February 17, 2003, Barber wore a t-shirt to school, the front of which displayed a photograph of President George W. Bush with the caption "International Terrorist" ("Barber's shirt" or "the t-shirt"). According to Barber, he wore the t-shirt to express his feelings about President Bush's foreign policies and the imminent war in Iraq.

Barber wore the t-shirt to his first class, Advanced Placement Language and Composition, which began at 7:30 a.m., and he continued to wear the t-shirt during his remaining morning classes. After his third hour class, Barber walked through the hallway to the lunchroom for the 10:30–11:00 a.m. lunch period.

After arriving at the lunchroom, Barber proceeded to the lunch line to see what was being served. In the meantime, at approximately 10:45 a.m., Shelton arrived at the lunchroom to supervise the lunch period. Three to five minutes after Shelton arrived, a student approached him and (in Shelton's words) told Shelton he was "angry" about Barber's shirt, thought "it was inappropriate" or "disrespectful," and wanted Shelton "to do something about it" or that "someone should take care of Brett for wearing that shirt." Shelton claims that he believed the student was angry because he was "kind of tense" and because of the "tone of his voice." Shelton explains, however, that it was not his impression at the time that the student intended to attack or harm Barber. Rather, Shelton believed the student wanted Shelton to do something about the t-shirt. In fact, Coebly states that when Shelton de-

scribed the incident to her a few hours later, he did not convey that the student posed a serious threat of imminent harm to Barber.

A few minutes after Shelton spoke with the student, William George ("George"), a teacher assigned to supervise the lunchroom, approached Shelton and asked him if he had seen Barber's shirt. Shelton told George that he had not seen the t-shirt, but had heard about it. George told Shelton that he thought Barber's shirt "may be inappropriate." Shelton then attempted to locate Barber in the lunchroom.

Approximately five minutes later, Shelton saw Barber making his way back to his table from the lunch line. After observing Barber's shirt, Shelton approached Barber and told him that it was inappropriate and that Barber had to turn it inside out or remove it.[1] When Barber refused, Shelton told him to go call his father.[2] Barber then proceeded to the school office, called his father, and left school for the remainder of the day.

During his deposition, Shelton attempted to explain why he asked Barber to turn the t-shirt inside out. According to Shelton, the student's and George's comments indicated to him that Barber's shirt already had created a disruption and possibly could create even more of a disruption in the school. Shelton also claims that he made his decision partly to protect Barber. Shelton acknowledges, however, that aside from the student's and teacher's comments in the lunchroom, he was unaware of any other unusual commotion or disruption in

the lunchroom or throughout the school as a result of Barber's shirt. Shelton does not believe that the t-shirt violated the Student Code of Conduct; and he does not believe that the t-shirt advocated drugs or alcohol or promoted terrorism.

According to Shelton, if Barber were to wear the t-shirt to school again, he would require Barber to turn it inside out or call home. Coebly informed Barber over the telephone a few hours after he left school on February 17, that Shelton deemed his t-shirt to be inappropriate because it already created a disruption or had the possibility of being disruptive and therefore he would not be allowed to wear it at school. According to Coebly, if Barber returned to school wearing the t-shirt and refused to remove it or turn it inside out, he would be sent to the office and would be written up for insubordination.

When asked whether she had any reasons aside from those set forth by Shelton for concluding that Barber's shirt was inappropriate, Coebly testified that the student who approached Shelton in the lunchroom also spoke with her a few days later and stated that "he really want[ed] to get Brett" because of the t-shirt, particularly because he had a relative in the military being sent to Iraq and at least one of his family members served in each of the country's prior wars. After talking to the student for a while, however, Coebly determined that he did not pose a threat to Barber.

1. Shelton gave Barber the option of removing the t-shirt because Barber was wearing another shirt underneath it.

2. It was Barber's impression that Shelton gave him the choice of turning the t-shirt inside out or calling his father to go home, although Barber could not recall specifically whether Shelton told him he needed to go home. Defendants spend a considerable time

arguing that Shelton in fact only told Barber to call his father and Barber went home voluntarily; and therefore Defendants claim Barber was not suspended for wearing the t-shirt. These factual disputes are immaterial, however, to the issue of whether Defendants violated Barber's First Amendment rights by prohibiting him from wearing the t-shirt. Barber is not seeking relief for any alleged suspension.

Coebly also claims that she felt Barber's shirt was inappropriate because many Dearborn High students or their families left Iraq because of Saddam Hussein's regime and she believes those students support what the United States is doing for their homeland. Coebly therefore believes that Barber's shirt would be "almost a personal attack on the Iraqi students." While Coebly acknowledges that no Iraqi students manifested disruptive behavior in response to the t-shirt, she fears a possibility of disruption based on her experience at Edsel Ford in 1991 during "Operation Desert Storm" (or "Desert Storm").[3]

According to Coebly, during Desert Storm, Yemenese students at Edsel Ford wore t-shirts or carried items (e.g. pictures in notebooks or in their lockers) with Saddam Hussein's picture. Coebly describes these items as "pro-Hussein" and she explains that many of the these students were angry about the United States' actions in Iraq at that time because they supported Saddam Hussein. Coebly claims that when other Edsel Ford students saw these items, fights broke out, students protested, a hundred students walked through the school with flags, and the police had to be summoned to the school to calm the situation.

Coebly believes that there is a potential for the reverse situation at Dearborn High–Barber's shirt may create a disruption among Iraqi students who support the United States' involvement in Iraq. As Coebly explains, the risk of disruption from Barber's shirt was particularly likely on February 17 due to the tense atmosphere at Dearborn High as a result of the imminent war in Iraq and the government's raising of the domestic terror alert level ten days earlier to indicate a high risk of terrorist attack. Coebly acknowledges, however, that under the same circumstances she would not find a "no war" button or "I hate Bush" t-shirt inappropriate.

## II. Preliminary Injunction Standard

■ This Court must consider four factors in deciding whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm without the injunction; (3) whether issuance of the injunction would cause substantial harms to others; and (4) whether the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir.2001). None of these four factors is a prerequisite to the issuance of a preliminary injunction; rather the Court must balance all four factors. *Neveux v. Webcraft Tech., Inc.*, 921 F.Supp. 1568, 1570–71 (E.D.Mich.1996)(citing *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir.1995)). Before a preliminary injunction may issue, however, a plaintiff must *always* demonstrate some irreparable injury that necessitates the injunction. *Id.* at 1571 (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir.1982)).

■ The primary purpose of a preliminary injunction is to maintain the status quo until a final decision on the merits can be reached. *Id.* (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). In cases where the plaintiff seeks a preliminary injunction not to maintain the status quo but rather to alter it, the plaintiff must "satisfy an even heavier burden of show-

---

**3.** "Operation Desert Storm" is the term used to refer to the United States' and United Nations' involvement in Iraq in 1990 and 1991 following Iraq's invasion of Kuwait on August 2, 1990. *See* "www.pbs.org/wgbh/pages /frontline/gulf/cron."

ing that the four factors listed above weigh heavily and compellingly in [his or her] favor." *Id.* (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir.1991)). "Like all equitable remedies, a preliminary injunction will not issue unless the right to relief is clear." *Id.* In determining whether to issue a preliminary injunction, the Court is not required to resolve "'doubtful questions of law or disputed questions of fact.'" *Id.* (quoting *Cincinnati Sub–Zero Prod. v. Augustine Med., Inc.*, 800 F.Supp. 1549, 1557 (S.D.Ohio 1992)).

## III. Applicable Law and Analysis

### A. Likelihood of Success on the Merits

The Supreme Court has made it clear that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Quoting from one of its earlier opinions, the *Tinker* Court explained the importance of protecting students' First Amendment rights:

"The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures Boards of Education not excepted ... That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of government as mere platitudes."

*Id.* (quoting *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)). Students' First Amendment rights extend beyond the classroom: "When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam ..." *Id.* at 512–13, 89 S.Ct. 733. The *Tinker* Court recognized, however, that students' First Amendment rights have to be balanced against "the need for affirming the comprehensive authority of the States and of school officials ... to prescribe and control conduct in the schools." *Id.*

The Court resolved these sometimes conflicting interests by holding that school officials may prohibit a particular expression of opinion if they can show that their "action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509, 89 S.Ct. 733. School officials must demonstrate that "the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Id.* (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966)). The Court warned, however, that school officials' fear of material and substantial interference must be based on something identifiable in the school setting, rather than on an unsubstantiated fear that a minority viewpoint will engender opposition:

[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take that risk ... and our history says that it is this sort of hazardous freedom this kind of openness that is the basis of our national strength and of the independence and vigor of Americans who grow up and live

in this relatively permissive, often disputatious, society.

*Id.* at 508–09, 89 S.Ct. 733 (internal citation omitted).

*Tinker* arose during one of the most controversial times in this Nation's history, the Vietnam War. Upon learning that students planned to wear black armbands to school to exhibit, in part, their disapproval of the Vietnam hostilities, school officials adopted a policy that students wearing armbands to school would be asked to remove them, and if they refused, would be suspended until they returned without armbands. *Tinker,* 393 U.S. at 504, 89 S.Ct. 733. The Supreme Court struck down the ban, finding that it prohibited a " 'symbolic act' ... closely akin to 'pure speech' which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment." *Id.* at 505–06, 89 S.Ct. 733. The Court found no evidence that the armbands "materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the school[s]" as there was "no indication that the work of the schools or any class was disrupted" and "[o]utside the classrooms, a few students made hostile remarks to the children wearing armbands, but there were no threats or acts of violence on school premises." *Id.* at 508–09, 89 S.Ct. 733.

The *Tinker* Court found it relevant that the school officials did not ban the wearing of all symbols that expressed controversial views. In fact, the record showed "that students in some of the schools wore buttons relating to national political campaigns, and some even wore the Iron Cross, traditionally a symbol of Nazism." *Id.* at 510, 89 S.Ct. 733. As the Court explained, "the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally

permissible." *Id.* at 511, 89 S.Ct. 733. In other words, as the Sixth Circuit Court of Appeals subsequently held, "viewpoint-specific speech restrictions are an egregious violation of the First Amendment" absent evidence that such speech causes or threatens material and substantial interference with a school's educational environment. *Castorina v. Madison County Sch. Bd.,* 246 F.3d 536, 540 (6th Cir.2001)(citing *Rosenberger v. Rector and Visitors of Univ. of Virginia,* 515 U.S. 819, 828–29, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) and *R.A.V. v. St. Paul,* 505 U.S. 377, 391–92, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).

Since *Tinker,* the Supreme Court has decided at least two significant cases addressing public school students' First Amendment rights: *Bethel School District No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) and *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). Defendants contend that the Supreme Court more clearly defined its *Tinker* standard in these cases; they argue that a standard incorporating language from all three cases should be applied to evaluate the present case. Some courts in fact have viewed *Fraser* and *Kuhlmeier* as casting "some doubt" on the holding in *Tinker* that students retain Free Speech rights in the school setting. *See, e.g., Boroff v. Van Wert City Bd. of Ed.,* 220 F.3d 465, 468 (6th Cir.2000)(quoting *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 737 (7th Cir.1994)). Other courts, however, account for the Supreme Court's application of different standards in *Fraser* and *Kuhlmeier* to the factual distinctions between those cases and *Tinker. See, e.g., Castorina,* 246 F.3d at 540; *McIntire v. Bethel Sch., Indep. Sch. District No. 3,* 804 F.Supp. 1415, 1426 (W.D.Okla.1992).

In *Fraser*, the Supreme Court held that a school district acted within its permissible authority in disciplining a student who gave an offensive, lewd, and indecent speech at a school assembly. Delivering the speech to nominate a fellow student for elective office, the student made several subtle and not-so subtle references to the nominee's genitals. *Fraser*, 478 U.S. at 687, 106 S.Ct. 3159 (Brennan, J., concurring). The Court distinguished the student's "sexually explicit monologue" in *Fraser* from the political message of the armbands in *Tinker*, finding that the former type of conduct has been historically curtailed in our Nation. *Id.* at 681–82, 106 S.Ct. 3159 (citing as an example, Thomas Jefferson's Manual of Parliamentary Practice prohibiting lawmakers from using "impertinent" speech during debates and "indecent language against the proceedings of the House"). The *Fraser* Court concluded that "it is a highly appropriate function of public school education to prohibit the use of *vulgar* and *offensive* terms in public discourse." *Id.* at 683, 106 S.Ct. 3159 (emphasis added).

But in reaching this conclusion, the Court did not limit its holding in *Tinker* that public school students' First Amendment rights are coextensive with those of adults provided their exercise of those rights does not materially disrupt the school setting or involve substantial disorder or invasion of the rights of others. Rather, the *Fraser* Court merely was delineating certain forms of speech sexually explicit or vulgar and offensive language that in particular can be said to be "wholly inconsistent with the 'fundamental values' of public school education." *Id.* at 685, 106 S.Ct. 3159. As the Court recognized, its "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is *sexually explicit* and the audience may be children." *Id.* at 684, 106

S.Ct. 3159 (emphasis added)(citing *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968))(upholding New York statute banning the sale of sexually oriented material to minors). The Court also pointed to its prior recognition of "an interest in protecting minors from exposure to *vulgar* and *offensive* spoken language." *Id.* (emphasis added)(citing *FCC v. Pacifica Found.*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978))(upholding FCC's regulation of a radio broadcast described as "indecent but not obscene.")

Further indication that the *Fraser* Court did not intend to limit *Tinker*, is its decision to uphold the school district's imposition of sanctions "in response to [the student's] offensively lewd and indecent speech." *Id.* at 685, 106 S.Ct. 3159. As the Court explained, "[u]nlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were unrelated to any political viewpoint." *Id.*

Almost two years later in *Kuhlmeier*, the Court held that school officials possess greater authority to limit student speech which is or appears to be school-sponsored. In reaching this conclusion, the *Kuhlmeier* Court reiterated that "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,' and must be 'applied in light of the special characteristics of the school environment.'" *Kuhlmeier*, 484 U.S. at 265, 108 S.Ct. 562 (internal citations omitted).

*Kuhlmeier* involved a high school principal's decision to excise two pages from a student newspaper published in connection with a journalism class. The principal decided to edit the pages because they contained two articles which he deemed inappropriate in a school-sponsored newspaper: a story describing three students'

experiences with pregnancy and an article discussing the impact of divorce on students at the school.[4] In holding that the principal's actions did not violate the students' First Amendment rights, the Court focused on the fact that the newspaper was not a "public forum," but rather was reserved by the school "as a supervised learning experience for its journalism students." *Id.* at 270, 108 S.Ct. 562.

The *Kuhlmeier* Court distinguished *Tinker*, explaining that the students' exercise of their First Amendment rights in *Tinker* merely happened on school grounds; whereas in the case before it, the students' expressive activities occurred in a school-sponsored forum:

> The question whether the First Amendment requires a school to tolerate particular student speech the question that we addressed in *Tinker* is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

*Id.* at 270–71, 108 S.Ct. 562. The *Kuhlmeier* Court concluded that when speech is or appears to be sponsored or endorsed by the school, educators have a greater responsibility "to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id.* at 271, 108 S.Ct. 562.

■ For those reasons, the *Kuhlmeier* Court held that school officials are entitled to exercise greater control over school-sponsored speech:

> A school must be able to set high standards for the student speech that is disseminated under its auspices standards that may be higher than those demanded by some newspaper publishers or theatrical producers in the "real" world- and may refuse to disseminate student speech that does not meet those standards. In addition, a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting.

*Id.* at 271–72, 108 S.Ct. 562. In this regard, school officials have the authority to refuse to *sponsor* speech that it perceives as advocating drugs, alcohol, or "conduct otherwise inconsistent with 'the shared values of a civilized social order,'" or that

---

4. In addition to finding the subject matter of the pregnancy story inappropriate, as it contained references to the students' sexual activity and birth control, the principal also was concerned that the stories did not protect the identities of the students involved. With respect to the story related to divorce, the principal's primary criticism was that the author failed to interview one of the parties involved in the story and thus that individual neither had the opportunity to respond to remarks about him nor consented to the publication.

sends the message that the school agrees with one particular side of a controversial political matter. *Id.* at 272, 108 S.Ct. 562.

The *Kuhlmeier* Court clearly announced that it was not overruling *Tinker* and that its holding only applies to school-sponsored expressive activities, not all student expression that happens to occur at school:

> [W]e conclude that the standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression. Instead, we hold that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech *in school-sponsored expressive activities* so long as their actions are reasonably related to legitimate pedagogical concerns.

*Id.* at 272–73, 108 S.Ct. 562 (emphasis added). The Court also clarified that its earlier decision in *Fraser* did not modify *Tinker,* explaining that its holding in *Fraser* "rested on the 'vulgar,' 'lewd,' and 'plainly offensive' character of a speech delivered at an official school assembly rather than on any propensity of the speech to 'materially disrup[t] classwork or involv[e] substantial disorder or invasion of the rights of others.'" *Id.* at 272 n. 4, 108 S.Ct. 562 (citations omitted).

██ It is this Court's belief that this case is controlled by the standard set forth in *Tinker. Fraser* is inapplicable as Barber's shirt did not refer to alcohol, drugs, or sex. Furthermore, it was neither obscene, lewd, nor vulgar; in fact, nothing in the record suggests that Coebly and/or Shelton viewed it this way. *Kuhlmeier* also is inapplicable as Barber's conduct clearly was not school-sponsored activity. Defendants contend that if they were prohibited from banning Barber's shirt, it would appear as if the school were endorsing his political message; however, no reasonable person could conclude that a school endorses the messages on its students' clothing. *See Castorina,* 246 F.3d at 543 (rejecting argument that school could be seen as endorsing student's display of the Confederate flag if it failed to ban t-shirt with flag on it). Accordingly, Defendants' decision to ban Barber's shirt only can withstand constitutional scrutiny if they show that the t-shirt caused a substantial disruption of or material interference with school activities or created more than an unsubstantiated fear or apprehension of such a disruption or interference.[5] Based on the evidence presently before this Court, it does not appear that Defendants can meet their burden.

Shelton found Barber's shirt inappropriate based upon one student's and one teacher's comments. Shelton claims that the student was angry and "threatened Barber." Shelton then admits, however, that he believed the student only wanted Shelton to take care of the t-shirt and did not intend to harm Barber. George's only comment to Shelton was that he felt Barber's shirt was inappropriate. Even when considered together, these comments do not constitute a material and substantial disruption of the school's activities. Furthermore, there is no evidence that the t-shirt created any disturbance or disruption

---

**5.** There does not appear to be any question that Barber's shirt constituted the type of symbolic act that is protected by the Free Speech Clause of the First Amendment. *See Castorina,* 246 F.3d at 539 (quoting *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)). Barber intended to convey a particularized message by wearing the t-shirt. Furthermore, the likelihood was great that Barber's message would be understood by those who viewed it. If this were not the case, Shelton's and Coebly's reasons for banning the t-shirt would make little sense.

in Barber's morning classes, in the hallway between classes or between Barber's third hour class and his lunch period, or during the first twenty-five minutes of the lunch period. Thus Defendants cannot show that a disruption already had occurred.

Shelton states that he told Barber to turn the t-shirt inside out or remove it because he believed the t-shirt could create a disruption and could even endanger Barber. The record however, does not reveal any basis for Shelton's fear aside from his belief that the t-shirt conveyed an unpopular political message. As stated earlier, however, to justify prohibition of a particular expression of opinion, school officials must be able to show that their action was caused by "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509, 89 S.Ct. 733.

The Court, however, must also consider Coebly's reasons for prohibiting Barber from wearing the t-shirt to school. Coebly fears the t-shirt will materially and substantially interfere with Dearborn High's operations based on her prior experience at Edsel Ford during Desert Storm. The Court is not presently persuaded that that incident which occurred more than ten years earlier at a different high school warranted the action taken by Coebly.

To support her decision, Coebly also points to the number of Iraqi students at Dearborn High, the fact that there was a threat of war, and the fact that the government increased the terrorist alert level to "high" or "orange" ten days prior to February 17. However, even taking these factors into consideration, the Court is not presently persuaded that Defendants' decision to prohibit Barber from wearing the t-shirt to school on the day in question was justified. Nor does the evidence presented thus far persuade the Court that Defendants are justified in prohibiting Barber from returning to school wearing the t-shirt.

While Defendants are correct that the demography of Dearborn High is relevant, *see Hill v. Lewis*, 323 F.Supp. 55, 58 (E.D.N.C.1971), they only have established that 31.4% of the school's students are Arabic. Defendants fail to indicate what percentage of these students are Iraqi.[6] But even if the majority or a large number of Dearborn High's Arab students are Iraqi, nothing in the present record suggests that these students were or would be offended by Barber's shirt which conveys a view about President Bush. More importantly, there is nothing in the record before this Court to indicate that those students, or any students at Dearborn High, might respond to the t-shirt in a way that would disrupt or interfere with the school environment. As Plaintiff's counsel noted at oral argument, it is improper and most likely detrimental to our society for government officials, particularly school officials, to assume that members of a particular ethnic group will have monolithic views on a subject and will be unable to control those views.

As the circumstances surrounding the conduct in *Tinker* suggest, Coebly's reliance on the fact that war in Iraq was imminent is not persuasive. Clearly the tension between students who support and those who oppose President Bush's decision to invade Iraq is no greater than the tension that existed during the United States' involvement in Vietnam between supporters of the war and war-protestors. Furthermore, and contrary to Defendants' counsel's assertion at oral argument, the courts have never declared that the school

6. As discussed *supra* at 5–6, Coebly's primary reason for prohibiting Barber from wearing the t-shirt, is her belief that it will incite Dearborn High's *Iraqi* students.

yard is an inappropriate place for political debate. In fact, as the *Tinker* Court and other courts have emphasized, students benefit when school officials provide an environment where they can openly express their diverging viewpoints and when they learn to tolerate the opinions of others. As one court has stated:

Our schools, like our communities at large, are invaluably improved by the diversity of their members. All students benefit from the respectful and thoughtful exchange of ideas and sharing of beliefs and practices. Schools, in particular, are vital environments that can provide an education of both the substance of diversity and the responsible manner with which such diversity is approached and expressed. It is incumbent upon the school, the parents, the students, and the community ... to work together so that divergent viewpoints, whether they be political, religious, or social, may be expressed in a civilized and respectful manner.

*Chambers v. Babbitt*, 145 F.Supp.2d 1068, 1073 (D.Minn.2001). As the *Chambers* court further noted, maintaining a school community of tolerance includes the tolerance of even the most intolerant or disagreeable viewpoints. *Id.*

For the reasons set forth above, and based on the record presently before the Court, the Court concludes that Plaintiff has a substantial likelihood of succeeding on the merits.

**B. Irreparable Harm**

■ The Supreme Court has repeatedly held that the loss of First Amendment freedoms, even temporarily, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1078 (6th Cir.1994)(holding that "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") Defendants argue that Barber "inappropriately relies" on *Elrod* and *G & V. Lounge* because both cases involve adults, not students, and neither case takes into consideration the Supreme Court's pronouncement in *Hazelwood* that the "First amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings."

Defendants cite no case law, however, to support their contention that students do not suffer irreparable harm when school officials wrongfully violate their First Amendment rights. Thus even if Defendants are correct that school officials possess greater authority to curtail students' rights, they offer no support for the notion that students do not suffer irreparable harm if those school officials exceed that authority. In fact, at least one court has held in a similar situation that students suffered irreparable harm when their First Amendment rights to Free Speech were violated. *McIntire*, 804 F.Supp. at 1428 (W.D.Okla.1992)(granting students' motion for preliminary injunction against school board superintendent and enjoining superintendent from prohibiting students from wearing particular t-shirt, reasoning that students would suffer irreparable harm as a result of the loss of their First Amendment rights, even for a minimal period of time).

Defendants also argue that Barber has not suffered irreparable harm because they are providing him alternative forums in which to express his views, for example, the classroom and the press. For this purpose, Defendants suggest that Shelton and Coebly are only prohibiting Barber from wearing the t-shirt in the cafeteria. But this claim is contrary to the record. Likewise, Defendants suggest that Shelton only asked Barber to turn the t-shirt in-

side out or remove it while in the cafeteria, but that Barber had been free to wear the t-shirt up until that time and presumably would be permitted to wear it upon returning to his classroom. This claim also is not supported by the record. As Shelton and Coebly indicate, Barber is prohibited from wearing the t-shirt *to school* at this time. Such absolute prohibition in this Court's opinion, may well constitute irreparable harm.

## C. Substantial Harm to Others and the Public Interest

 Barber argues that the public interest is served when free expression is protected. As the *McIntire* court stated, "The public has an interest in the protection and preservation of First Amendment rights. 'Vindication of constitutional freedoms and protection of First Amendment rights is in the *public interest.*'" *McIntire*, 804 F.Supp. at 1429.

Defendants contend, however, that allowing Barber to wear the t-shirt to school will force the school to cease normal "beginning of the school year" operations, pointing to the "media frenzy" spawned by the incident on February 17.[7] But while some of Barber's fellow students may have expressed anger about the attention the school received as a result of the February 17 incident, Shelton testified that the students in fact "have handled it pretty well." As Shelton acknowledges, there has not been any kind of demonstration, disruption, or commotion as a result of the media's presence. Thus this Court is not persuaded that Defendants' concern is presently justified.

Defendants also argue that issuance of an injunction will undermine school officials' authority to regulate student behavior and preclude officials from exercising

their legal discretion to react to Barber's (and presumably other students') "future free exercise when circumstances warrant it." While considering the present matter, the Court has remained mindful that in order for schools to effectively serve their purpose it is necessary that students respect school officials' authority. As the Court stated at oral argument, authority figures sometimes make mistakes, but students cannot be led to believe that it is proper for them to respond by saying "you're wrong and I am not going to do what you say." Nothing in this opinion, therefore, should suggest that school officials may not exercise their authority and prohibit students from exercising their First Amendment rights within the parameters of the Constitution and according to the Supreme Court's relevant First Amendment jurisprudence. For example, when student speech is school-sponsored, or lewd, obscene, or vulgar (including related to alcohol or drugs), school officials may curtail that speech. Furthermore, if school officials are justified in their belief—in other words, if there is an objective basis for their belief—that "speech" has "materially and substantially interfere[d]" with school operations or if they are reasonably justified in believing that there is a substantial basis for concluding that it will do so, school officials may take appropriate action to curtail that speech.

Finally, Defendants argue that the public interest will be best served by maintaining the status quo, which they define as "[l]eaving to the discretion of state elected and appointed school officials the decision of what to do, if anything, should Barber, come the commencement of school, again express himself in a manner which, under the particular circumstances presented,

---

7. After Barber returned home on February 17, he notified two local television stations and two local newspapers about the incident. Thereafter, news crews and reporters came to Dearborn High's campus.

would legally permit or justify a response." Whether the public interest in fact is served by this status quo depends on Defendants' understanding as to what "circumstances" permit them to prohibit Barber from wearing the t-shirt to school. If Defendants believe that the circumstances thus far presented are sufficient, circumstances which the Court finds do not provide a constitutionally permissible rationale for Defendants' decision, it cannot be said that the status quo benefits the public. As the Court stated in *Chambers v. Babbitt*, 145 F.Supp.2d 1068 (D.Minn.2001),

> [T]he Court's decision to grant injunctive relief serves to reinstate the *status quo* as of [the date the clothing was banned], which is that a student's freedom of expression is protected in the school environment to the extent that a school does not otherwise have a reasonable belief that such expression could lead to substantial disruption of the school environment or material interference with school activities.

*Chambers*, 145 F.Supp.2d. at 1072–73. Thus if Barber chooses to wear the t-shirt to school again and other circumstances are presented that lead Defendants to reasonably believe that the t-shirt is substantially disrupting or interfering with school activities or that it could lead to a substantial disruption of the school environment or material interference with school activities, the Court then will entertain a request to dissolve the preliminary injunction.

For the reasons set forth above, Barber's Motion for a Preliminary Injunction shall be **GRANTED**.