Zachary GUILES, by his mother and father and next friends, Cynthia LUCAS and Timothy Guiles, Plaintiff,

v.

Seth MARINEAU, Kathleen Morris–Kortz, Douglas Shoik and Rodney Graham, Defendants.

No. 2:04–CV–132.

United States District Court, D. Vermont.

Dec. 20, 2004.

David J. Williams, Esq., St. Johnsbury, VT, for Plaintiff.

Anthony B. Lamb, Esq., Burlington, VT, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SESSIONS, Chief Judge.

### I. Introduction

This case requires the Court to balance the important values of a public school student's right to free speech and the authority of school officials to control the learning environment. The controversy here arose when a student, Zachary Guiles ("Zach"), at Williamstown Middle High School ("WMHS") wore a T-shirt critical of President George W. Bush. School administrators determined that the T-shirt was unacceptable school dress in so far as it contained images depicting drugs and alcohol. Zach was told that he could wear the shirt to school only if he covered the offending portions with tape.

Zach filed this action claiming that the censorship of the T-shirt was a violation of his First Amendment rights. He asked the Court to issue an injunction barring the defendants from further disciplining him for wearing the T-shirt and directing the defendants to expunge his disciplinary record connected with his wearing of the T-shirt.[1] A three-day bench trial followed.

While mindful that students retain significant First Amendment freedoms in an educational setting, for the reasons outlined below, the Court finds that the defendants stayed within the bounds set by the First Amendment when they required Zach to cover those symbols on his T-shirt that depict drugs and alcohol.

### II. Facts

#### A. The Parties

Zachary Guiles, is a minor and brings this suit by his parents and next friends, Cynthia Lucas and Timothy Guiles. In May 2004, he was a seventh grade student at WMHS, his local public school. Zach, who during his testimony showed himself to be very articulate and mature for his age, is a good student who participates in extracurricular activities. Zach also plays trombone with the Vermont Youth Orchestra.[2] In the current school year, Zach is being home-schooled. Zach is still present at WMHS, however, as he attends music classes and participates in the school band.

All of the defendants are being sued in their official capacity. Defendant Seth Marineau was the Student Support Specialist at WMHS during the 2003–2004 academic year. Enforcing school policy (including the dress code) and disciplining students is an important part of his job. In the coming academic year, Marineau will be an Assistant Principal at WMHS. Defendant Kathleen Morris–Kortz is the Principal of WMHS and has supervisory authority over Marineau.

Defendant Douglas Shoik is the Superintendent of the Orange North Supervisory Union, which includes WMHS. Defendant Rodney Graham is the chairperson of the School Board for the Town of Williamstown, Vermont.

#### B. Factual Findings

At some point in March 2004, Zach began wearing a T-shirt to school that is

---

1. Zach's complaint also requested an injunction declaring WMHS's Appearance and Dress policy unconstitutional and void. At trial, Zach withdrew this request.

2. It seems that plaintiffs in cases challenging school censorship tend to be especially bright and creative students. *See, e.g., Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 692, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (Stevens, J. dissenting) ("The respondent was an outstanding young man with a fine academic record."); *Pyle v. S. Hadley Sch. Comm.,* 861 F.Supp. 157, 160 (D.Mass.1994) (plaintiffs, sons of a constitutional law professor, were highly successful in academic and extracurricular activities).

critical of President George W. Bush. Zach obtained this shirt from a representative of the Vermont Green Party at an anti-war rally. The shirt is highly critical of President Bush and contains many different symbols and blocks of text.[3] Pl.'s Ex. 1.

The shirt's largest text (found on both the front and the back) refers to President Bush as the "Chicken–Hawk–in–Chief" who is engaged in a "World Domination Tour."[4] In smaller text, the shirt accuses the President of being a "crook," "AWOL draft dodger," "lying drunk driver" and an abuser of marijuana and cocaine. The shirt is covered with a variety of images including oil wells, dollar signs and chickens. Included among these images are some small drawings depicting drugs and alcohol.

The front and the back of the shirt include a large image of President Bush wearing a helmet with "AWOL" written on it. The President's small and very crudely drawn body appears to be the body of a chicken. In one 'wing' the President is holding a martini glass. In the other 'wing' the President is holding a straw. Next to the straw are three lines of cocaine and a razor blade.

Other small images of drugs and alcohol are found on the T-shirt's sleeves. The left sleeve includes an image of a chicken with a champagne bottle on one side and three lines of cocaine on the other. The right sleeve has a coat of arms labeled "Chicken Hawk Guard" and includes a drawing of a soldier drinking from a bottle. There is no question that, as a whole, the T-shirt communicates a very strong political message of disapproval (if not disdain and outright loathing) of the President's character and policies.

Zach wore the shirt approximately once per week for two months. Although some students expressed disapproval of Zach's shirt, this did not lead to any major disruption or fights. Some students complained to teachers about the shirt but the teachers responded that the shirt was permitted. These initial determinations were based on very brief inspections and the teachers did not notice the small drawings depicting drugs. Eventually, one of Zach's teachers, Kathleen Raymond, did notice these drawings and mentioned the shirt to WMHS's principal, Kathleen Morris–Kortz. The school principal did not find time to inspect Zach's shirt. Thus, it wasn't until May 12, 2004 that school authorities acted to censor the shirt.

On May 12, Guiles attempted to wear the shirt on a school field trip. A parent, who had come to school to assist with the field trip, complained to Seth Marineau, the student support specialist at Williamstown Middle High School. Marineau inspected the T-shirt and decided that it probably violated the school's dress code. Marineau called Superintendent Douglas Shoik to discuss the issue and they determined that the shirt did violate the code. The school dress policy reads in relevant part:

> We recognize that personal expression through dress is an important aspect of our culture for developing a sense of individualism, and this should be allowed to develop within our system. However, we must remember we are part of an academic community and our guidelines must reflect a sense of responsibility and integrity.

---

**3.** As Zach's teacher Kathleen Raymond testified, it is a very "busy" shirt.

**4.** Zach testified that, in this context, "Chicken–Hawk" is intended to refer to someone who shows an enthusiasm for war but a personal reluctance to fight.

Therefore, we need to separate personal expression from offensiveness by the following guidelines:

- Any aspect of a person's appearance, which otherwise constitutes a real hazard to the health and safety of self and others or is otherwise distracting, is unacceptable as an expression of personal taste. Example [Clothing displaying alcohol, drugs, violence, obscenity and racism is outside our responsibility guidelines as a school and is prohibited.]

Williamstown Middle High Sch. Student/Parent Handbook 2003–2004 at 13, Pl.'s Ex. 2. Specifically, Marineau and Shoik concluded that the T-shirt violated the prohibition on clothing displaying alcohol or drugs.

Marineau provided Guiles with three choices: (1) turn the shirt inside out; (2) tape over the images of drugs and alcohol plus the word "cocaine"; or (3) change shirts. After presenting Zach with these options, Marineau began to have doubts about whether the dress code required Zach to cover the word "cocaine" as well as the images of drugs. Marineau did not communicate this doubt to Zach, however, so Zach was given the impression that he would have to cover the word "cocaine" to be in compliance with school policy.

Zach asked to call his father, Tim Guiles. Zach and his father met with Marineau and then visited Superintendent Shoik. Shoik reaffirmed Marineau's decision. At that point, Zach went home for the day.

On May 13, 2004, Zach returned to school wearing the same T-shirt. Marineau again instructed him to either change shirts, turn the shirt inside out or tape over the offending portions. Zach declined these choices and Marineau filled out a Discipline Referral Form and sent Zach home for the rest of the day. Pl.'s

Ex. 3. There is some dispute between the parties about whether this disciplinary action constituted a 'suspension.' Regardless of the exact label attached to the action, however, it is undisputed that Zach was removed from school for the day and this is now part of Zach's disciplinary record at WMHS.

On May 14, Zach wore the T-shirt once again. This time, however, he covered the symbols depicting drugs and the word "cocaine" with duct tape. He wrote "censored" on each piece of duct tape. At some point during the day, Marineau saw Zach and inspected the shirt. Marineau told Zach that the shirt was now acceptable under the school dress code.

The defendants have required other students to change their clothing to conform to the school's dress code. Marineau and other teachers have required students to remove "Budweiser" hats and T-shirts advertising alcohol. Zach's shirt is the first article of censored clothing that included political content, however. On May 27, 2004, Zach filed this lawsuit challenging the school's actions.

At trial, the defendants submitted the deposition testimony of Carol L. Rose. Rose Dep. (Defs.' Ex. DD). Rose is the prevention and safety coordinator for the Safe and Healthy School Team at the Vermont Department of Education. Rose testified that, although Zach's shirt communicated an anti-Bush message, it could also communicate a mixed message about drugs. In particular, Rose was concerned that students could conclude that using drugs and alcohol are acceptable because one can use them and still become president of the United States. *Id.* at 33:13–24, 62:18–63:7. Rose also testified that it is important for educators to be able to control students' exposure to messages about drugs within the learning environment.

See id. at 9:21–10:17. Rose called this an "environmental approach" to drug and alcohol education. Id.

The defendants also testified about the importance of controlling messages about drugs and alcohol at school. They explained that the prohibition of displays of drugs and alcohol is part of WMHS's overall anti-drug policy and philosophy. They expressed concern that unsupervised exposure to images of drugs could breed familiarity and acceptance among their middle school students. The defendants explained that it can be difficult to determine the exact meaning of their students' clothing.[5] Thus, they prefer a bright-line rule against any display of drugs and alcohol. This prevents students from wearing clothing that may suggest disapproval of drugs but is actually intended to present a pro-drug message. Moreover, the bright-line rule enables educators to supervise and control their students' exposure to drug images within the school environment.

Zach offered the testimony of the former principal of Montpelier High School, Charles Phillips. Phillips explained that he took a different approach at his school. He claimed that he did not apply a bright-line rule prohibiting any clothing that depicted drugs or alcohol. Rather, he prohibited any clothing that promoted the use of drugs and alcohol. Thus, he would not have censored Zach's T-shirt because he did not believe that it promoted drugs or alcohol.

The defendants explained that WMHS's dress code does not prevent students from wearing clothing containing text that addresses the issue of drugs. For example, the school does not prohibit the wearing of anti-drug D.A.R.E. T-shirts (even though administrators suspect that some students

wear these shirts in a spirit of ironic defiance).

Although few students have been caught using drugs or alcohol on school premises, administrators at WMHS consider drug and alcohol use to be a serious concern. This concern is based on a number of factors. School administrators regularly liaise with local police about drug problems in the community. Administrators also receive reports from students, particularly from students seeking help from the school's Student Assistance Program. Finally, administrators consider the worrying results of a survey conducted as a combined initiative by Vermont's Department of Health and Department of Education. See The 2003 Vermont Risk Behavior Survey, Summary Results for Participating Schs. in the Orange N. Supervisory Union at 14–31, Defs.' Ex. M. These factors provide authorities at WMHS with substantial grounds for prioritizing drug prevention policies. Given the potentially devastating consequences of drug addiction, educators at WMHS believe that they have a responsibility to do what they can to help their students stay away from drugs.

## III. Discussion

### A. The Defendants' Motion to Dismiss

■ At the close of trial, the defendants moved to dismiss for failure to join a necessary party under Rule 19. Under Rule 19, a case can be dismissed if a judgment would not be effective because of the absence of a non-party. Fed.R.Civ.P. 19(b). The defendants claim that they do not have the authority to alter WMHS's dress policy. They claim that only the School Board for the Town of Williamstown can change the policy. According to the defen-

5. Defendants offered the example of the apparently innocuous number "420" which can refer to marijuana and a tradition of smoking marijuana on April 20.

dants, this means that the Court would not be able to provide the relief sought by Zach.

Zach has sued the chairperson of the School Board for the Town of Williamstown, Rodney Graham, in his official capacity. This means he has sued the head of the body that could change the dress code at WMHS. This may give the Court authority to order that the policy be changed. The Court does not have to reach this issue, however. This is because Zach has not requested this kind of relief. The only question for the Court is whether it can enjoin these defendants from *enforcing* the dress code.

At the start of trial, Zach made it clear that he only sought an injunction preventing the defendants from censoring his anti-Bush T-shirt. Zach withdrew his request for declaratory relief holding WMHS's dress policy unconstitutional. Similarly, Zach has never asked the Court for an order directing the defendants to enact a new policy. Zach only seeks an injunction against enforcement. The defendants enforce the policy at Zach's school. Thus, the case can proceed against these defendants.

The defendants argue that a court cannot enjoin enforcement without joining a defendant who is capable of changing the underlying policy. Clearly, this cannot be correct. If it were, a plaintiff could not ask for an injunction prohibiting enforcement of a state law without joining the state legislature as a party.

Case law supports this conclusion. "It is well-settled that a state official may properly be made a party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional act if that official plays some role in the enforcement of the act." *Schulz v. Williams*, 44 F.3d 48, 61 n. 13 (2d Cir.1994) (quotation marks and citation omitted). In fact, *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) illustrates this fundamental principle. In *Young*, the Supreme Court upheld an injunction prohibiting a state attorney general from enforcing a state law. *See Young*, 209 U.S. at 157–62, 28 S.Ct. 441. This injunction was allowed even though the attorney general did not have the authority to change the law. As the *Young* Court noted, "[i]n such case no affirmative action of any nature is directed, and the officer is simply prohibited from doing an act which he had no legal right to do." *Id.* at 159, 28 S.Ct. 441.

Similarly, if Zach can show that the defendants have violated the Constitution by censoring his T-shirt then the Court could enjoin the defendants from further acts of censorship. Thus, the defendants' motion to dismiss is denied.

**B. Applicable Supreme Court Authority Concerning School Students' Right to Freedom of Expression**

■ The Supreme Court has made it clear that the First Amendment protects the free speech rights of students within the school setting. Thus, "[i]t can hardly be argued that either students or teachers shed their constitutional rights at the schoolhouse gate." *Tinker v. Des Moines Ind. Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). For example, the First Amendment prevents schools from compelling students to salute the flag. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Similarly, the Establishment Clause of the First Amendment prevents schools from requiring students to participate in prayer. *See Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

Expressive rights deserve special attention within the school setting because edu-

cators serve as role models to their students. "That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Barnette*, 319 U.S. at 637, 63 S.Ct. 1178. While recognizing the importance of students' freedom of expression, the Supreme Court has noted that expressive rights must be balanced against educators' need to maintain discipline and create a positive learning environment. *See, e.g., Tinker*, 393 U.S. at 507, 89 S.Ct. 733 (noting the need to balance constitutional protection of speech with the authority of schools "to prescribe and control conduct").

Three major Supreme Court decisions provide the framework for approaching cases involving the First Amendment rights of school students. The first case is *Tinker*, in which a group of high school students wore black armbands as a silent protest against the Vietnam War. School administrators asked the students to remove the armbands while in school. *Tinker*, 393 U.S. at 504, 89 S.Ct. 733. Some students refused to comply with this request and were suspended. *Id.* The Court held that the wearing of an armband as a protest is an expressive act protected by the Free Speech Clause of the First Amendment. *See id.* at 505–06, 89 S.Ct. 733. The Court emphasized that the wearing of armbands "was entirely divorced from actually or potentially disruptive conduct." *Id.* at 505, 89 S.Ct. 733. Thus, by censoring the protest, the school administrators were censoring "pure speech." *See id.* at 505–06, 89 S.Ct. 733. The Court held that:

> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained.

*Id.* at 509, 89 S.Ct. 733 (quotation marks and citation omitted).

■ *Tinker* holds that whenever school officials make a content-based prohibition of speech they must have "evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline." *Id.* at 511, 89 S.Ct. 733. Moreover, this evidence must be more than a mere "undifferentiated fear or apprehension of disturbance" if it is to overcome a student's right to freedom of expression. *Id.* at 508, 89 S.Ct. 733.

In *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the Supreme Court further defined the boundaries of freedom of expression in schools. In *Fraser*, a high school had disciplined a student for giving a student government nominating speech filled with sexual innuendo. The Court emphasized the "marked distinction between the political "message" of the armbands in *Tinker* and the sexual content of the respondent's speech in this case." *Id.* at 680, 106 S.Ct. 3159. The Court upheld the authority of the school to prohibit lewd or offensive speech even if this is not necessary to avoid material and substantial interference with schoolwork. *See id.* at 685–86, 106 S.Ct. 3159; *see also Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 256 (4th Cir.2003) (noting that "*Fraser* establishes an exception to *Tinker's* disruption requirement").

■ It is important to note that, in *Fraser*, "the penalties imposed ... were unrelated to any political viewpoint." *Fraser*, 478 U.S. at 685, 106 S.Ct. 3159. This distinguishes *Fraser* from *Tinker*. Under *Fraser*, administrators may ensure that the *form or manner* of speech is appropriate for the school setting even though they may not regulate the *political content* of the speech unless they satisfy *Tinker's* disruption test. The Supreme Court explained this point with a reference to *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). *See Fraser*, 478 U.S. at 682–83, 106 S.Ct. 3159. In *Cohen*, the Court upheld the plaintiff's right to wear a jacket bearing the slogan "Fuck the Draft." *Cohen*, 403 U.S. at 23–26, 91 S.Ct. 1780. In *Fraser*, the Court noted that it does not follow that "simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school." *Fraser*, 478 U.S. at 682, 106 S.Ct. 3159. Thus, "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket." *Id.* (quotation marks and citation omitted).

■ Finally, the most recent Supreme Court decision addressing school speech is *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). In *Hazelwood*, the school had censored articles in the school newspaper. The Court held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273, 108 S.Ct. 562.

■ Overall, these cases show that different standards apply in the school set-ting depending on the content and the context of the speech. In general, if educators censor student speech based on its political content then, under *Tinker*, they must have specific grounds for suspecting that the speech will disrupt the educational environment. If the speech occurs in a school-sponsored forum, however, then *Hazelwood* applies and the censorship only needs to be reasonably related to educational goals. Finally, under *Fraser*, educators may censor speech if the censorship is unrelated to the political message of the speech and is intended only to ensure that the speech is not lewd or otherwise offensive.

**C. Applying the Law to this Case**

■ The question in this case is whether, consistent with this body of law, the defendants may prohibit Zach from displaying the images of drugs and alcohol on his clothing. It is clear that Zach's T-shirt is not school-sponsored speech. Thus, *Hazelwood* is not applicable. *See Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 543 (6th Cir.2001) (rejecting an argument that the school would be seen as endorsing a student's T-shirt displaying the confederate flag if it failed to ban the shirt). The more difficult issue is whether *Tinker* or *Fraser* is most relevant.

There is no question that Zach's T-shirt is political speech. This does not mean that *Tinker's* stringent disruption standard automatically applies, however. *Fraser* can be applied to lewd or inappropriate speech even if the speech has political content. Cohen's memorable jacket, for example, would fall within *Fraser's* ambit even though it expressed a political point about the draft. *See Fraser*, 478 U.S. at 682, 106 S.Ct. 3159. Cohen's jacket could be censored because its political point is expressed through profanity. If administrators censor speech based on its mes-

sage, however, then *Tinker* must be applied. The central question, therefore, is whether the defendants have acted to censor a viewpoint or whether they have acted to censor a form of speech that is inappropriate for the middle school environment.

The evidence strongly suggests that the defendants were not motivated by the T-shirt's anti-Bush message. In fact, school authorities allowed Zach to wear his T-shirt uncensored until they noticed the images of drugs. Moreover, the school has allowed Zach to continue to wear the shirt as long as he places tape over these small images. In this form, the shirt's anti-Bush message is still patently clear. Thus, the Court is satisfied that the defendants have acted pursuant to a neutral policy prohibiting dress bearing images of drugs and alcohol.

At this point, it is useful to contrast the facts of this case with those in *Barber v. Dearborn Pub. Schs.*, 286 F.Supp.2d 847 (E.D.Mich.2003). In *Barber*, a student was prohibited from wearing a shirt that displayed an image of George Bush with the caption "International Terrorist." The school argued that this censorship was required because the shirt might offend Iraqi students at the school. *See Barber*, 286 F.Supp.2d at 857. The court rejected this argument. The court noted the school had not met the burden set by *Tinker* because it had not shown that the shirt was likely to cause any disruption that would interfere with the school environment. *See id.*

Similarly, if the defendants in this case had censored the anti-Bush message of Zach's shirt then *Tinker* would be applied. The defendants would not prevail under the *Tinker* standard because they have not shown that the shirt will materially and substantially interfere with the educational environment. Defendants cannot make this showing because Zach wore his T-shirt on a number of occasions without causing disruption.

This case is distinguishable from *Barber*, however. *Barber* involved a clear example of political censorship. The defendants in *Barber* were concerned that the political message of the T-shirt would offend other students or cause disruption. The District Court specifically noted that "*Fraser* is inapplicable as Barber's shirt did not refer to alcohol, drugs or sex." *Barber*, 286 F.Supp.2d at 856. In contrast, this case concerns a dress policy prohibiting images of drugs and alcohol that has been applied in a politically neutral manner. Thus, *Fraser* is applicable.

It is also worth noting that the defendants' policy does not prohibit all clothing that addresses the topic of drugs. Thus, the policy is distinguishable from that held unconstitutionally overbroad in *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249 (4th Cir.2003). In *Newsom*, the court reviewed a policy prohibiting students from wearing any "messages on clothing ... that relate to drugs, alcohol, tobacco, weapons, violence, sex, vulgarity, or that reflect adversely upon persons because of their race or ethnic group." *Newsom*, 354 F.3d at 253. This policy silences any comment on the issue of drugs and would prohibit even anti-drug D.A.R.E. T-shirts. Thus, the policy in *Newsom* censored more than the *manner* of speech but removed entire topics from discussion. Thus, *Fraser* could not be applied to that policy. *See, e.g., East High Gay/Straight Alliance v. Bd. of Educ. Of Salt Lake City Sch. Dist.*, 81 F.Supp.2d 1166, 1193 (D.Utah 1999) ("*Fraser* speaks to the form and manner of student speech, not its substance. It addresses the mode of expression, not its content or viewpoint.")

WMHS's dress code is different. WMHS does not silence all commentary on the topic of drugs. Rather, the defen-

dants have interpreted their policy as only prohibiting images displaying drugs and alcohol.[6] The dress code considered in *Newsom* would exclude any comment on President Bush's conviction for drunk driving or allegations regarding cocaine use. As such, that policy would censor much of the political content of Zach's shirt. In contrast, WMHS's policy leaves the text addressing these issues untouched. Thus, the policy at WMHS is entitled to review under the standard set by *Fraser* as it addresses only the manner of speech rather than its substance.

■ Having determined that the defendants have only censored the manner rather than the message of Zach's speech, the next question is whether the images of drugs and alcohol are offensive or inappropriate for the middle school environment. If the images of drugs are inappropriate then, under *Fraser*, they may be censored. The defendants and Carol Rose all testified that, based on their experience, student dress bearing images of drugs and alcohol is inappropriate for WMHS. They suggested that such clothing would interfere with their ability to present a consistent message regarding drugs and alcohol. They also testified that a bright-line rule enables them to prohibit clothing, such as Zach's, that might communicate a mixed message about drugs. In contrast, Charles Phillips testified that, at his high school, he only prohibited clothing that promoted the use of drugs and alcohol. Phillips did agree with the defendants' claim that consistency is very important for a school's overall anti-drug efforts. Moreover, Phillips' policy was designed for a high school while WMHS is a middle school and includes students as young as eleven.

Zach's shirt includes images of alcohol and no fewer than three images of cocaine alongside drug paraphernalia. This Court accepts the judgment of the defendants that such images are an inappropriate form of expression for their middle school. Although an alternate approach, such as that taken by Phillips at Montpelier High School, is possible, these decisions are best left to experienced educators in the field rather than federal judges. As long as a school is not censoring political content, school officials may prohibit dress bearing images of drugs and alcohol as inappropriate for the school environment. Thus, Zach is not entitled to an injunction allowing him to wear his T-shirt without tape covering the displays of drugs and alcohol.

## D. The Disciplinary Action

■ Although Zach is not entitled to an injunction allowing him to wear the uncensored shirt, he is entitled to relief on his disciplinary record. There is a discrepancy between the defendants' position at trial and the initial demand they made of the plaintiff. At trial, the defendants only sought to retain the authority to prohibit the images of drugs and alcohol on Zach's shirt. In contrast, Marineau told Zach that he also had to cover textual references to cocaine. Moreover, Marineau did not tell Zach about his subsequent doubts about this request. Thus, Zach was under the impression that he had to cover textual references to cocaine if he wanted to avoid being sent home from school.

Effectively, on both May 12 and May 13, Zach was given a choice between expressing his views about President Bush's alleged drug use or going home. Thus, his viewpoint rather than just his manner of expression was censored and *Tinker* must be applied. As explained above, the defen-

---

**6.** As Zach withdrew his challenge to the constitutionality of the policy as a whole, the Court is considering the policy as applied in this case.

dants cannot satisfy *Tinker's* disruption test because the evidence showed that Zach wore his T-shirt on a number of occasions without causing any significant disruption.

This Court appreciates the difficulty of Marineau's task. His initial decision was made in the context of a busy school day rather than after lengthy rumination upon the finer points of constitutional law. In fact, Marineau and the other defendants showed respect for Zach's free speech rights and were sensitive to the fact that his T-shirt communicated a political message. Nevertheless, by asking Zach to cover all textual references to cocaine, Marineau impermissibly infringed Zach's right to freedom of speech as guaranteed by the First Amendment. Thus, Zach's disciplinary record should be expunged.

## IV. Conclusion

For the reasons set forth above, the Court finds that the defendants may prohibit Zach from displaying the images of drugs and alcohol on his anti-Bush T-shirt. Thus, Zach is not entitled to injunctive relief barring defendants from further disciplining him for wearing the shirt. However, the Court does find that the defendants' initial act of censorship violated Zach's right to freedom of speech as guaranteed by the First and Fourteenth Amendments. Therefore, the Court orders that the defendants expunge any disciplinary record Zachary Guiles acquired in connection with therewith.

CASE CLOSED