461 F.3d 320
 Zachary GUILES, by his father and next friend, Timothy GUILES; and by his mother and next friend Cynthia Lucas, Plaintiff-Appellant-Cross-Appellee,
v.
Seth MARINEAU, Kathleen Morris-Kortz, Douglas Shoik and Rodney Graham, Defendants-Appellees-Cross-Appellants.
 Docket No. 05-0327-CV(L).
 Docket No. 05-0517-CV(XAP).
 United States Court of Appeals, Second Circuit.
 Argued October 28, 2005.
 Decided August 30, 2006.
 
 Stephen L. Saltonstall, Barr, Sternberg, Moss, Lawrence, Silver & Saltonstall, P.C., Bennington, VT (David J. Williams, Sleigh & Williams, St. Johnsbury, VT, of counsel; ACLU Foundation of Vermont, Inc., cooperating attorney), for Plaintiff-Appellant-Cross-Appellee.
 Anthony B. Lamb, Burlington, VT (Mary L. Desautels, Lamb & Desautels, Attorneys at Law, P.C., Burlington, VT, of counsel), for Defendants-Appellees-Cross-Appellants.
 Before CARDAMONE, POOLER, and SOTOMAYOR, Circuit Judges.
 CARDAMONE, Circuit Judge.
 
 
 1
 This case requires us to sail into the unsettled waters of free speech rights in public schools, waters rife with rocky shoals and uncertain currents. Plaintiff Zachary Guiles, a 13-year-old student at Williamstown Middle High School (WMHS, Williamstown High School, or school) in Williamstown, Vermont, claims his right under the First Amendment to wear a T-shirt depicting President George W. Bush in an uncharitable light has been violated. The T-shirt, through an amalgam of images and text, criticizes the President as a chicken-hawk president and accuses him of being a former alcohol and cocaine abuser. To make its point, the shirt displays images of drugs and alcohol.
 
 
 2
 Upon the complaint of another student and her mother, school officials made Guiles put duct tape over the alcohol- and drug-related pictures on the ground that those illustrations violate a school policy prohibiting any display of such images. Plaintiff, through his mother and father, brought the instant action to enjoin the school's application of the policy to his shirt, asserting that the policy violates his freedom to engage in political speech. After a three-day bench trial, the United States District Court for the District of Vermont (Sessions, C.J.) held the school's censorship a permissible abridgement of Guiles's First Amendment rights. From this holding the plaintiff appeals. The district court also ordered that the disciplinary action defendants took against plaintiff be expunged from his school record. From this holding defendants appeal. Guiles ex rel. Lucas v. Marineau, 349 F.Supp.2d 871 (D.Vt.2004). For the reasons set forth below, we affirm in part, vacate in part, and remand this case to the district court.
 
 BACKGROUND
 A. The Parties
 
 3
 In May 2004 plaintiff Guiles was a seventh-grade student at Williamstown Middle High School. Defendant Seth Marineau was the student support specialist at the school during the 2003-2004 academic year. His job included enforcing dress code policy. Defendant Kathleen Morris-Kortz was the principal of the high school, and defendant Douglas Shoik was the superintendent of the Orange North Supervisory Union, which includes WMHS (collectively, defendants). In his action Guiles has sued the defendants in their official capacities.
 
 B. The T-shirt
 
 4
 In March 2004 plaintiff began wearing the offending T-shirt to school. He had purchased it at an anti-war rally he attended. The front of the shirt, at the top, has large print that reads "George W. Bush," below it is the text, "Chicken-Hawk-In-Chief." Directly below these words is a large picture of the President's face, wearing a helmet, superimposed on the body of a chicken. Surrounding the President are images of oil rigs and dollar symbols. To one side of the President, three lines of cocaine and a razor blade appear. In the "chicken wing" of the President nearest the cocaine, there is a straw. In the other "wing" the President is holding a martini glass with an olive in it. Directly below all these depictions is printed, "1st Chicken Hawk Wing," and below that is text reading "World Domination Tour."
 
 
 5
 The back of the T-shirt has similar pictures and language, including the lines of cocaine and the martini glass. The representations on the back of the shirt are surrounded by smaller print accusing the President of being a "Crook," "Cocaine Addict," "AWOL, Draft Dodger," and "Lying Drunk Driver." The sleeves of the shirt each depict a military patch, one with a man drinking from a bottle, and the other with a chicken flanked by a bottle and three lines of cocaine with a razor. Without question Guiles's T-shirt uses harsh rhetoric and imagery to express disagreement with the President's policies and to impugn his character.
 
 C. School Action Relating to the T-shirt
 
 6
 Guiles wore the T-shirt on average once a week for two months. Although the shirt evoked discussion from students, it did not cause any disruptions or fights inside or outside the school. But, the T-shirt raised the ire of one fellow student whose politics evidently were opposed to Guiles's. This student complained to teachers who told her that the shirt was political speech and therefore protected.
 
 
 7
 On May 12, 2004 Guiles was to go on a school field trip. He wore the T-shirt that day. A parent who was to chaperone the trip—indeed the parent of the student who had previously complained to teachers regarding the shirt—noticed the shirt and voiced her objection to defendant Marineau.
 
 
 8
 Marineau, after consulting with Shoik, determined that the T-shirt, specifically the images of drugs and alcohol, violated the following provision of the WMHS dress code:
 
 
 9
 Any aspect of a person's appearance, which constitutes a real hazard to the health and safety of self and others or is otherwise distracting, is unacceptable as an expression of personal taste. Example [Clothing displaying alcohol, drugs, violence, obscenity, and racism is outside our responsibility and integrity guideline as a school community and is prohibited].
 
 
 10
 WMHS Student/Parent Handbook 2003-2004 at 13 (brackets in original).
 
 
 11
 Marineau gave Guiles three choices: (1) turn the shirt inside-out; (2) tape over the images of the drugs and alcohol and the word "cocaine"; or (3) change shirts. Marineau was unsure whether the word cocaine violated the policy. He did not, however, relay this doubt to the student, leaving the student to think that it too must be taped over. Guiles's father came in to speak with Marineau, who reiterated that the shirt contravened dress code policy. Guiles and his father then went to speak with Shoik who reaffirmed what Marineau had said. Guiles returned home with his father for the remainder of that day.
 
 
 12
 On May 13, 2004 plaintiff returned to school wearing the T-shirt. Marineau again instructed him to tape over the offending images with duct tape, turn the shirt inside out, or change shirts. Guiles declined, and Marineau filled out a discipline referral form and sent plaintiff home. The discipline referral form remains in Guiles's record. On May 14, 2004 Guiles again wore the T-shirt to school, this time, however, with the images of drugs and alcohol and the word "cocaine" covered with duct tape. On the duct tape plaintiff had scrawled the word "Censored."
 
 DISTRICT COURT PROCEEDINGS
 
 13
 Plaintiff then brought suit in federal district court seeking to enjoin defendants from enforcing the dress code policy with regard to his T-shirt, and the district court conducted a three-day bench trial. Defendants submitted the deposition testimony of Carol L. Rose, the prevention and safety coordinator for the Safe and Healthy School Team at the Vermont Department of Education. Rose opined that the Williamstown High School's policy of prohibiting all images of drugs and alcohol (even such images used on anti-drug T-shirts and posters) was appropriate because it furthers the school's environmental approach—which calls for limiting student exposure to all such images. However, when asked whether "clothing that depicts anti-alcohol, drug or cigarette messages is just as harmful to students as clothing that advertises it," she responded that she did not know.
 
 
 14
 Plaintiff submitted a letter of the Vermont Department of Education stating that it did not take a position with respect to the merits of the case and that "[t]estimony provided by deposition of Carol Rose ... was not intended to draw any conclusions with respect to the outcome of the case or any substantive legal issue therein [and][t]o the extent it did, it did not reflect an official position" of the Department. Guiles also presented the testimony of Charles Phillips, a former principal of a neighboring school. Phillips testified that at his school the approach was to ban images that advocated drug and alcohol use. He also testified that he was unaware of any evidence that anti-drug and anti-alcohol messages encouraged students to use such substances. Because Guiles's T-shirt conveyed an anti-drug message, he would not have censored it at his school.
 
 
 15
 Finding the images plainly offensive or inappropriate under Bethel School District No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the district court held the school's censorship of the images was proper and declined to issue an injunction. The trial court also held the school violated Guiles's free speech rights by censoring the word cocaine, and therefore it ordered the discipline referral form expunged from Guiles's academic record. Guiles and defendants both appeal.
 
 DISCUSSION
 Standard of Review
 
 16
 Normally we review the district court's findings of fact for clear error and its conclusions of law de novo. See Fed. R.Civ.P. 52(a); Ramos v. Town of Vernon, 353 F.3d 171, 174 (2d Cir.2003). But because this appeal concerns allegations of abridgement of free speech rights, we do not defer to the district court's findings of fact. Instead, in First Amendment cases we make an independent and searching inquiry of the entire record, since we are obliged to conduct a "fresh examination of crucial facts . . . so as to assure ourselves that [the lower court's] judgment does not constitute a forbidden intrusion on the field of free expression." Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group, 515 U.S. 557, 567-68, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995); see also Bery v. City of New York, 97 F.3d 689, 693 (2d Cir. 1996) ("[W]e are required to make an independent examination of the record as a whole without deference to the factual findings of the trial court.").
 
 I Free Speech Law in Schools
 
 17
 We wrestle on this appeal with the question of how far a student's constitutional right freely to express himself on school grounds extends. As the Supreme Court aptly put it, "[o]ur problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). We begin with several premises. First, we are mindful that the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of [our] schools." Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). Thus neither party disputes that "students have First Amendment rights to political speech in public schools." Brandon v. Bd. of Educ., 635 F.2d 971, 980 (2d Cir.1980). But while students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," Tinker, 393 U.S. at 506, 89 S.Ct. 733, neither are their rights to free speech "automatically coextensive with the rights of adults," Fraser, 478 U.S. at 682, 106 S.Ct. 3159. Indeed even for adults it is familiar law that "the right of free speech is not absolute at all times and under all circumstances." Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (noting that certain limited categories of speech may be prevented without raising a constitutional problem: "These include the lewd and obscene, the profane, the libelous, and the insulting or `fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.").
 
 
 18
 With these basic precepts in mind, we discuss Tinker, Fraser, and Hazelwood, a trilogy of cases in which the Supreme Court enunciated standards for assessing whether a school's censorship of student speech is constitutionally permissible.
 
 
 19
 Tinker involved high school students who, to protest the Vietnam war, sought to wear black armbands to school. 393 U.S. at 504, 89 S.Ct. 733. In light of this proposed collective act of expression, the school prohibited the wearing of black armbands and punished students who ignored the ban. Id. Holding that this constituted an unconstitutional abridgement of the students' free speech rights, the Supreme Court ruled that with regard to "personal expression that happens to occur on the school premises," Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (discussing Tinker), a student may "express his opinions, even on controversial subjects . . . if he does so without materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others," Tinker 393 U.S. at 513, 89 S.Ct. 733 (alteration in original). The rule of Tinker has come to mean that a school may not regulate student expression unless the regulation may be "justified by a showing that the student['s] [speech] would materially and substantially disrupt the work and discipline of the school." Id.; see also Hazelwood, 484 U.S. 260, 280-81, 108 S.Ct. 562, 98 L.Ed.2d 592 (Brennan, J., dissenting) ("[O]fficial censorship of student expression ... is unconstitutional unless the speech materially disrupts classwork or involves substantial disorder or invasion of the rights of others.").
 
 
 20
 Nearly two decades later the Supreme Court revisited student speech in Fraser. School officials in Fraser disciplined a student for giving a speech peppered with sexual innuendo at a school assembly. Fraser, 478 U.S. at 677-79, 106 S.Ct. 3159. The Court held the school's actions permissible because "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse" among its students. Id. at 683, 106 S.Ct. 3159. Schools may regulate student speech insofar as it is "vulgar," "lewd," "indecent," or "plainly offensive." Id. at 683-85, 106 S.Ct. 3159; Hazelwood, 484 U.S. at 271 n. 4, 108 S.Ct. 562 ("The decision in Fraser rested on the `vulgar,' `lewd,' and `plainly offensive' character of" the student's speech). The Court declined to apply Tinker's more exacting material and substantial disturbance test because the student's speech was "unrelated to any political viewpoint." Fraser, 478 U.S. at 685, 106 S.Ct. 3159.
 
 
 21
 The Supreme Court's examination of student speech continued in Hazelwood, where school officials censored certain articles in the school newspaper written by students regarding teen-age pregnancy and a student's experience with divorce. Hazelwood, 484 U.S. at 263-65, 108 S.Ct. 562. The Supreme Court upheld the school's action relying on the distinction between school-sponsored speech and student speech that happens to occur on school grounds. See id. at 270-73, 108 S.Ct. 562. In the case of the former, school officials may exercise editorial control over student speech "so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273, 108 S.Ct. 562; see also Peck v. Baldwinsville Cent. Sch. Dist., 426 F.3d 617, 627-29 (2d Cir.2005) (discussing difference between Tinker—speech that happens to occur on school property—and Hazelwood— school sponsored speech).
 
 
 22
 We distill the following from Tinker, Fraser, and Hazelwood:
 
 
 23
 (1) schools have wide discretion to prohibit speech that is less than obscene—to wit, vulgar, lewd, indecent or plainly offensive speech, Fraser, 478 U.S. at 683-85, 106 S.Ct. 3159; Hazelwood, 484 U.S. at 272 n. 4, 108 S.Ct. 562;
 
 
 24
 (2) if the speech at issue is "school-sponsored," educators may censor student speech so long as the censorship is "reasonably related to legitimate pedagogical concerns," Hazelwood, 484 U.S. at 273, 108 S.Ct. 562; and
 
 
 25
 (3) for all other speech, meaning speech that is neither vulgar, lewd, indecent or plainly offensive under Fraser, nor school-sponsored under Hazelwood, the rule of Tinker applies. Schools may not regulate such student speech unless it would materially and substantially disrupt classwork and discipline in the school. See Tinker, 393 U.S. at 513, 89 S.Ct. 733.
 
 
 26
 Our articulation of the Tinker—Fraser—Hazelwood trilogy is in accord with how other circuits commonly understand these cases. See, e.g., Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 214 (3d Cir.2001) (Alito, J.) ("To summarize: Under Fraser, a school may categorically prohibit lewd, vulgar or profane language. Under Hazelwood, a school may regulate school-sponsored speech . . . . Speech falling outside of these categories is subject to Tinker's general rule . . . ."); Chandler v. McMinnville Sch. Dist., 978 F.2d 524, 529 (9th Cir.1992) ("We conclude . . . that the standard for reviewing the suppression of vulgar, lewd, obscene, and plainly offensive speech is governed by Fraser, school-sponsored speech by Hazelwood, and all other speech by Tinker.").
 
 
 27
 We pause here to acknowledge some lack of clarity in the Supreme Court's student-speech cases. Tinker involved political viewpoint-based discrimination and established a "material and substantial interference" test that permits schools to restrict student speech only where, as noted, "necessary to avoid material and substantial interference with schoolwork or discipline." 393 U.S. at 511, 89 S.Ct. 733. It is not entirely clear whether Tinker's rule applies to all student speech that is not sponsored by schools, subject to the rule of Fraser, or whether it applies only to political speech or to political viewpoint-based discrimination. Nor is Tinker entirely clear as to what constitutes "substantial disorder" or "substantial disruption" of or "material interference" with school activities. Id. at 513-14, 89 S.Ct. 733. The opinion alludes to "threats [and] acts of violence on school premises," id. at 508, 89 S.Ct. 733, but does not otherwise explain what might qualify as "materially and substantially disrupt[ing] the work and discipline of the school." Id. at 513, 89 S.Ct. 733.
 
 
 28
 Language in the Supreme Court's subsequent ruling in Hazelwood sheds some light on these questions by suggesting that the Court considers the rule of Tinker to be generally applicable to student-speech cases. Hazelwood, 484 U.S. at 270-73, 108 S.Ct. 562 (distinguishing between the Tinker standard "for determining when a school may punish student expression" and "the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression"). But see Fraser, 478 U.S. at 680, 106 S.Ct. 3159 (noting "[t]he marked distinction between the political `message' of the armbands in Tinker and the sexual content of [the] speech in this case" and that the Court had upheld "the students' right to engage in a nondisruptive, passive expression of a political viewpoint in Tinker" (emphasis added)); id. at 685, 106 S.Ct. 3159 (noting that the penalties imposed for the sexually explicit speech were "unrelated to any political viewpoint" and thus did not implicate the rule of Tinker); Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 866, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion) (stating that Tinker "held that students' rights to freedom of expression of their political views could not be abridged by reliance upon an `undifferentiated fear or apprehension of disturbance' arising from such expression" (emphasis added)). Proceeding according to the understanding that Tinker applies to all non-school-sponsored student speech that is not lewd or otherwise vulgar, we note that if the "material and substantial interference" test is meant to describe vocal protests and disputes of similar character and magnitude, schools must tolerate a great deal of student speech that is not lewd or vulgar. Put differently, Tinker established a protective standard for student speech under which it cannot be suppressed based on its content, but only because it is substantially disruptive.
 
 II Applying the Supreme Court Standards
 
 29
 We turn next to which standard applies to this appeal. That the parties vigorously contest this point is not surprising. Where this case falls on the Tinker—Fraser—Hazelwood spectrum primarily determines whether the defendants' censorship of Guiles's T-shirt survives First Amendment scrutiny. For the reasons set out below, we hold that neither Hazelwood nor Fraser govern, and therefore, the general rule of Tinker applies.
 
 A. Hazelwood Does Not Apply
 
 30
 We agree with the district court that Hazelwood is inapplicable. The deferential standard of Hazelwood, which permits schools to regulate student speech so long as the regulation reasonably relates to "legitimate pedagogical concerns," Hazelwood, 484 U.S. at 273, 108 S.Ct. 562, comes into play only when the student speech is "school-sponsored" or when a reasonable observer would believe it to be so sponsored, see id. at 273-74, 108 S.Ct. 562; Peck, 426 F.3d at 628-29; Saxe, 240 F.3d at 213-14 (noting that "Hazelwood's permissive `legitimate pedagogical concern' test governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself" (emphasis added)). No one disputes that the school did not sponsor Guiles's T-shirt or that the T-shirt could not reasonably be viewed as bearing the school's imprimatur. While we do not doubt that an anti-drug and alcohol policy may be of "legitimate pedagogical concern" to schools, absent school sponsorship, defendants may not look to Hazelwood for support.
 
 B. Fraser Does Not Apply
 
 31
 We disagree with the district judge that Fraser governs this case. The district court applied Fraser, reasoning that it must ask whether "the images of drugs and alcohol are offensive or inappropriate," and concluding that, if so, "then, under Fraser, they may be censored." Guiles, 349 F.Supp.2d at 881 (emphasis added). The trial court then accepted the "judgment of the defendants that such images are an inappropriate form of expression for their middle school" and accordingly, upheld the school's censorship of Guiles's T-shirt. Id. We believe the district court misjudged the scope of Fraser and, consequently, applied it in error.
 
 
 32
 Fraser's reach is not as great as the trial court presumed. Fraser permits schools to censor student speech that is "lewd," "vulgar," "indecent," or "plainly offensive." Fraser, 478 U.S. at 683-85, 106 S.Ct. 3159; Hazelwood, 484 U.S. at 271 n. 4, 108 S.Ct. 562 (discussing Fraser). We thus ask whether the images of a martini glass, a bottle and glass, a man drinking from a bottle, and lines of cocaine constitute lewd, vulgar, indecent, or plainly offensive speech. We think it clear that these depictions on their own are not lewd, vulgar, or indecent. Lewdness, vulgarity, and indecency normally connote sexual innuendo or profanity. See Merriam-Webster's Third New Int'l Dictionary 1147, 1301, 2566 (1st ed.1981) (defining (a) "lewd" as "inciting to sensual desire or imagination," (b) "vulgar" as "lewd, obscene, or profane in expression," and (c) "indecent" as "being or tending to be obscene").
 
 
 33
 We are left then with the question of whether the pictures are plainly offensive. Indeed, the district court held Fraser applicable on the basis of its "plainly offensive" language, which it interpreted broadly. Guiles, 349 F.Supp.2d at 881. What then constitutes plainly offensive speech under Fraser? And, can we say that depictions of drugs and alcohol such as those on Guiles's T-shirt are plainly offensive? These are questions of first impression in this Circuit. While what is plainly offensive is not susceptible to precise definition, we hold that the images depicted on Guiles's T-shirt are not plainly offensive as a matter of law.
 
 
 34
 Dictionaries commonly define the word offensive as that which causes displeasure or resentment or is repugnant to accepted decency. See Merriam-Webster's Third Int'l Dictionary 1156; Black's Law Dictionary 1110 (7th ed.1999). We doubt the Fraser Court's use of the term sweeps as broadly as this dictionary definition, and nothing in Fraser suggests that it does. But if it does, then the rule of Tinker would have no real effect because it could have been said that the school administrators in Tinker found wearing anti-war armbands offensive and repugnant to their sense of patriotism and decency. Yet the Supreme Court held the school could not censor the students' speech in that case.
 
 
 35
 What is plainly offensive for purposes of Fraser must therefore be somewhat narrower than the dictionary definition. Courts that address Fraser appear to treat "plainly offensive" synonymously with and as part and parcel of speech that is lewd, vulgar, and indecent—meaning speech that is something less than obscene but related to that concept, that is to say, speech containing sexual innuendo and profanity. See Frederick v. Morse, 439 F.3d 1114, 1118-19 (9th Cir.2006) (discussing Fraser's focus on sexually charged nature of student speech); see also Saxe, 240 F.3d at 213 (noting that "Fraser permits a school to prohibit words that `offend for the same reasons that obscenity offends'"). In fact, the Supreme Court deemed Fraser's speech could be freely censored because it was imbued with sexual references, bordering on the obscene. See Fraser, 478 U.S. at 683, 106 S.Ct. 3159 ("The pervasive sexual innuendo in Fraser's speech was plainly offensive to both teachers and students." (emphasis added)).
 
 
 36
 What is more, the cases cited by Fraser all concern vulgarity, obscenity, and profanity. See Fraser, 478 U.S. at 684-85, 106 S.Ct. 3159, where the Supreme Court cites Ginsberg v. New York, 390 U.S. 629, 639-41, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (upholding ban on sale of sexually oriented material to minors); Pico, 457 U.S. at 871-72, 102 S.Ct. 2799 (acknowledging that school may remove "pervasively vulgar" books from library); and FCC v. Pacifica Found., 438 U.S. 726, 745-48, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (upholding FCC's ability to censor "obscene, indecent, or profane" speech). It is further instructive on this point that the Ninth Circuit's recent opinion in Frederick refused to uphold a school's disciplinary action against a student who displayed a clearly pro-drug banner, which read "Bong Hits 4 Jesus." Frederick, 439 F.3d at 1123. In distinguishing Fraser and holding it did not apply, the Ninth Circuit stated: "The phrase `Bong Hits 4 Jesus' may be funny, stupid, or insulting, depending on one's point of view, but it is not `plainly offensive' in the way sexual innuendo is." Id. at 1119.
 
 
 37
 Judge Newman's oft-quoted concurrence in a case that pre-dates Fraser also suggests that the district court's reading of Fraser is incorrect. Judge Newman noted that "[t]he First Amendment does not prevent a school's reasonable efforts toward the maintenance of campus standards of civility and decency" and memorably stated that "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket." Thomas v. Bd. of Educ., Granville Cent. Sch. Dist., 607 F.2d 1043, 1057 (2d Cir. 1979) (Newman, J., concurring) (referring to Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), in which the Supreme Court upheld an adult's right to wear a jacket bearing the statement "[F . . . expletive deleted] the Draft"). The import of his analysis was that "a school can act to keep indecent language from circulating on high school grounds." Id. Fraser itself quoted Judge Newman and indicated that its rule applies to the "manner of speech," i.e., the offensiveness of its form, but not the speech's content. 478 U.S. at 682-83, 685, 106 S.Ct. 3159; see also Hazelwood, 484 U.S. at 286 n. 2, 108 S.Ct. 562 (Brennan, J., dissenting) (stating that Fraser is limited to "the appropriateness of the manner in which the message is conveyed, not of the message's content") (emphasis in original); Newsom ex rel. Newsom v. Albemarle County Sch. Bd., 354 F.3d 249, 256 (4th Cir.2003) ("When speech in school falls within the lewd, vulgar, and plainly offensive rubric, it can be said that Fraser limits the form and manner of speech, but does not address the content of the message."); Boroff v. Van Wert City Bd. of Educ., 220 F.3d 465, 473 (6th Cir.2000) (Gilman, J., dissenting) (noting that the terms "vulgar" and "offensive" in Fraser "refer to words and phrases that are themselves coarse and crude, regardless of whether one disagrees with the overall message that the speaker is trying to convey").
 
 
 38
 Moreover, the Fraser Court, in noting the "interest in protecting minors from exposure to vulgar and offensive spoken language," discussed at some length its earlier opinion in Pacifica, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073. Fraser, 478 U.S. at 684-85, 106 S.Ct. 3159. Pacifica involved comedian George Carlin's "Filthy Words" monologue, which the Fraser Court characterized as "vulgarity." Id. at 685, 106 S.Ct. 3159. It noted that the words comprising the monologue, which dealt with sexuality and excretion, "offend for the same reasons that obscenity offends." Id.; Saxe, 240 F.3d at 213 (noting that "Fraser permits a school to prohibit words that `offend for the same reasons that obscenity offends'"). For these reasons and others we discuss below, although we need not conclusively determine what is "plainly offensive" under Fraser to resolve the instant case, we decline to adopt the position of the Sixth Circuit in Boroff that a school has broad authority under Fraser to prohibit speech that is "inconsistent with its basic educational mission." 220 F.3d at 470; Frederick, 439 F.3d at 1122 (declining to follow Boroff's implication that schools have "wide-ranging discretion to determine the appropriateness or inappropriateness of certain messages at school" under Fraser).
 
 
 39
 Here, the images of a martini glass, alcohol, and lines of cocaine, like the banner in Frederick, may cause school administrators displeasure and could be construed as insulting or in poor taste. We cannot say, however, that these images, by themselves, are as plainly offensive as the sexually charged speech considered in Fraser nor are they as offensive as profanity used to make a political point. See Thomas, 607 F.2d at 1057 (Newman, J., concurring in result). We do not think in light of this discussion that the images on plaintiff's T-shirt are plainly offensive, especially when considering that they are part of an anti-drug political message.
 
 III Defendants' Argument Rejected
 
 40
 Defendants principally declare that all images of illegal drugs and alcohol—even images expressing an anti-drug view, such as those on Guiles's T-shirt—are plainly offensive because they undermine the school's anti-drug message. We do not find this argument persuasive.
 
 
 41
 To begin, sister circuits have rejected similar arguments. In Newsom, 354 F.3d 249, the Fourth Circuit addressed a school dress code that prohibited all images of weapons on clothing. Id. at 254. The student in Newsom was told not to wear a National Rifle Association T-shirt that depicted "`men shooting guns.'" Id. at 253. As in the case before us, the school in Newsom relied on the argument that the image conflicted with the school's "message" that "Guns and Schools Don't Mix." Id. at 252-53. In striking the dress code as overly broad, Newsom applied Tinker instead of Fraser and held essentially that while pictures of weapons that promote violence may arguably be regulated, id. at 257, it cannot be said that all such depictions are per se offensive, see id. at 259-60 (ruling that ban on all images of weapons overly broad); accord Frederick, 439 F.3d at 1121. Similarly, in Castorina ex rel. Rewt v. Madison County School Board, 246 F.3d 536 (6th Cir.2001), the Sixth Circuit was confronted with a school's order that reprimanded a student for wearing clothing bearing confederate flags. Id. at 538. Confederate flags have been associated with racist ideology, and could undermine the school's mission to promote tolerance. But the Sixth Circuit applied Tinker rather than Fraser and remanded the case for further fact-finding regarding disruption. Id. at 543-44.
 
 
 42
 The flaw in defendants' position is that it conflates the rule of Hazelwood with Fraser, and in doing so, eviscerates Tinker. Defendants censored the images because they believed such images were contrary to the school's basic educational aim of having an anti-drug school environment. We observe in passing that the witness offered by defendants to opine on their environmental methodology did not point to any specific evidence showing that antidrug and alcohol images are harmful or lead to the use (or increased abuse) of such substances by high school students.
 
 
 43
 Moreover, the phrase "plainly offensive" as used in Fraser cannot be so broad as to be triggered whenever a school decides a student's expression conflicts with its "educational mission" or claims a legitimate pedagogical concern. Were that the rule then Fraser would effectively swallow Hazelwood's holding that school officials may censor student speech if (1) the censorship reasonably relates to a legitimate pedagogical concern, and (2) the speech is school-sponsored. Hazelwood, 484 U.S. at 273-74, 108 S.Ct. 562. Indeed, if schools were allowed to censor on such a wide-ranging basis, then Tinker would no longer have any effect. As the Ninth Circuit aptly stated
 
 
 44
 All sorts of missions are undermined by legitimate and protected speech—a school's anti-gun mission would be undermined by a student passing around copies of John R. Lott's book, More Guns, Less Crime; a school's anti-alcohol mission would be undermined by a student e-mailing links to a medical study showing less heart disease among moderate drinkers than teetotalers
 
 
 45
 ....
 
 
 46
 Frederick, 439 F.3d at 1120. We therefore decline to adopt defendants' sweeping reading of Fraser.
 
 
 47
 While the exact contours of what is plainly offensive are not so clear to us as the star Arcturus is on a cloudless night, they are evident enough for us to hold that the images of drugs and alcohol on Guiles's T-shirt are not offensive, let alone plainly so, under Fraser. We believe this is especially so given that these images are presented as part of an anti-drug T-shirt, and, moreover, a T-shirt with a political message. Indeed the Fraser court distinguished its holding from Tinker in part on the absence of any political message in Fraser's speech. See Fraser, 478 U.S. at 685, 106 S.Ct. 3159 (refusing to apply Tinker because Fraser's speech did not involve political viewpoint).
 
 IV Tinker Applies
 
 48
 Having determined that neither Hazelwood nor Fraser apply, we turn to Tinker. Applying Tinker to the facts of this case, we conclude that defendants' censorship of the images on Guiles's T-shirt violated his free speech rights. The parties agree that Guiles's T-shirt did not cause any disruption or confrontation in the school. Nor do defendants contend they had a reasonable belief that it would. Guiles wore the T-shirt on average once a week for two months without any untoward incidents occurring. Only when a fellow student's mother—who had different political views from plaintiff—protested did defendants direct Guiles to cover the drug and alcohol illustrations. Because Guiles's T-shirt did not cause any disruption, defendants' censorship was unwarranted.
 
 
 49
 We find no merit in defendants' "no harm, no foul contention," namely, that though they directed the images covered, the text and other images remained, and hence, the political message of the T-shirt was left intact. The pictures are an important part of the political message Guiles wished to convey, accentuating the anti-drug (and anti-Bush) message. By covering them defendants diluted Guiles's message, blunting its force and impact. Such censorship may be justified under Tinker only when the substantial disruption test is satisfied.
 
 
 50
 We add that our holding on this appeal is limited. Guiles brings only an as-applied challenge to the dress code. He seeks declaratory relief enjoining defendants from enforcing the dress code as it applies to his particular T-shirt. We thus make no holding with respect to whether images of illegal drugs and alcohol on a T-shirt that promotes drug and alcohol use could be censored under the Supreme Court's student-speech cases. While the Court has indicated, in dicta, that "[a] school must ... retain the authority to refuse to sponsor speech that might reasonably be perceived to advocate drug or alcohol use," Hazelwood, 484 U.S. at 272, 108 S.Ct. 562 (emphasis added), it has never addressed this issue. At least one of our sister circuits, however, has held that a school could not punish students for waiving a pro-drug banner near campus at a school-authorized event without reaching the question of whether the school could prohibit a student from wearing a pro-drug T-shirt on campus. Frederick, 439 F.3d at 1123 & n. 45. We address only the images on Guiles's T-shirt and do not prejudge any question to be presented in a subsequent case.
 
 
 51
 Finally, defendants have cross-appealed that part of the district court's holding that the school should expunge Guiles's disciplinary record. Because we find that Guiles was entitled to the injunction permitting him to wear his T-shirt, we must affirm the ruling that Guiles's suspension should be expunged from his school record.
 
 CONCLUSION
 
 52
 Accordingly, for the foregoing reasons, we vacate the district court's order insofar as it denied Guiles's declaratory judgment action seeking to enjoin defendants from enforcing the dress code with regard to his T-shirt. We affirm the district court's holding that the disciplinary action should be expunged from Guiles's record and remand this matter to the district court for further proceedings consistent with this opinion.